UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| A.P. by next friend E.P. and D.P., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:23-cv-00358 |
| | § | |
| Pearland Independent School District, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT PEARLAND INDEPENDENT SCHOOL DISTRICT'S
MOTION FOR JUDGMENT ON THE RECORD AND
RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD**

Kendra E. Yoch
State Bar No. 24134039
Southern District No. 3864905
kyoch@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
972-853-5115 Telephone
(713) 583-8884 Facsimile

Rebecca S. Bailey
State Bar No. 24062597
Southern District No. 921729
rbailey@thompsonhorton.com

**THOMPSON & HORTON LLP**
Phoenix Tower, Suite 2000
3200 Southwest Freeway
Houston, Texas 77027
(713) 554-6762– Telephone
(713) 583-9364 – Facsimile

*Attorneys for Defendant*
*Pearland Independent School District*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I.     NATURE AND STAGE OF THE PROCEEDINGS ................................. 1

II.    STANDARD OF REVIEW/BURDEN OF PROOF ................................. 1

III.   SUMMARY OF THE ARGUMENT ........................................................ 2

IV.    FACTUAL BACKGROUND ................................................................... 4

       A.    Elementary and Middle School ..................................................... 4

       B.    High School .................................................................................... 5

             1.    Attendance ........................................................................... 6

             2.    Ninth Grade Courses ........................................................... 9

             3.    Tenth Grade Courses ......................................................... 11

       C.    Child Find and Evaluation ........................................................... 13

V.     ARGUMENT AND AUTHORITIES ..................................................... 17

       A.    The SEHO Correctly Found that the District Did Not Violate
             Child Find .................................................................................... 17

             1.    The Child Find Obligation ................................................. 17

             2.    The District had no reason to suspect A.P. was a student with
                   a disability in need of specialized instruction prior to the due
                   process complaint. ............................................................. 19

             3.    After Parents informed the District of a suspected disability, the
                   District met it's child find obligation by timely offering an
                   evaluation ......................................................................... 23

       B.    Parents did not establish that A.P. is a student with a disability ................. 24

VI.    CONCLUSION ....................................................................................... 29

CERTIFICATE OF SERVICE ......................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.S. v. Five Town Cmty. Sch. Dist.*,
  513 F.3d 279 (1st Cir. 2008) ..................................................................... 23

*Ashley G. v. Copperas Cove Indep. Sch. Dist.*,
  No. 6:19-CV-00420-ADA-JCM, 2021 WL 1840910 (W.D. Tex. May 7,
  2021), *aff'd Ashley G. as Next Friend of M.G. v. Copperas Cove Indep.
  Sch. Dist.*, No. 21-50437, 2022 WL 797416 (5th Cir. Mar. 15, 2022) ................ 19, 20

*C.G. v. Five Town Cmty. Sch. Dist.*,
  No. CIV 05-237-P-S, 2007 WL 494994 (D. Me. Feb. 12, 2007) ................................. 23

*Culley v. Cumberland Valley Sch. Dist.*,
  758 Fed. Appx 301 (3d Cir. 2018) ................................................................ 23

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*,
  118 F.3d 245 (5th Cir. 1997) ....................................................................... 1

*D.L. v. Clear Creek Indep. Sch. Dist.*,
  695 Fed. Appx. 733 (5th Cir. 2017) ................................................... 21, 25, 27

*Dallas Indep. Sch. Dist. v. Woody*,
  178 F. Supp. 3d 443 (N.D. Tex. 2016), *aff'd in part and rev'd in part*,
  865 F.3d 303 (5th Cir. 2017) ....................................................................... 19

*Dallas Indep. Sch. Dist. v. Woody*,
  865 F.3d 303 (5th Cir. 2017) ....................................................................... 2

*Daniel R.R. v. State Bd. of Educ.*,
  874 F.2d 1036 (5th Cir. 1989) ..................................................................... 2

*El Paso Indep. Sch. Dist. v. Richard R.*,
  567 F. Supp. 2d 918 (W.D. Tex. 2008) ........................................................ 19

*A.W. ex rel. H.W. v. Middletown Area Sch. Dist.*,
  No. 1:13-CV-2379, 2015 WL 390864 (M.D. Pa. Jan. 28, 2015) ................................. 24

*Leigh Ann H. v. Riesel Indep. Sch. Dist.*,
  18 F.4th 788 (5th Cir. 2021) ....................................................................... 19

*Malloy v. District of Columbia*,
    No. 20-CV-03219 (DLF), 2022 WL 971208 (D.D.C. Mar. 30, 2022) ....................... 23

*O.P. v. by Perez v. Weslaco Indep. Sch. Dist.*,
    No. 7:21-CV-00352, 2022 WL 3651967 (S.D. Tex. Aug. 24, 2022) ................... 19, 30

*Oliver v. Dallas Indep. Sch. Dist.*,
    No. Civ.A. 3:01-CV-2627-, 2004 WL 1800878 (N.D. Tex. Aug. 11,
    2004) ..........................................................................................................20, 21, 22

*Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*,
    900 F.3d 673 (5th Cir. 2018) ................................................................................ 2, 18

*Rayna P. v. Campus Cmty. Sch.*,
    No. CV 16-63, 2018 WL 3825893 (D. Del. Aug. 10, 2018) ....................................... 23

*Richardson Ind. Sch. Dist. v. Michael Z.*,
    580 F.3d 286 (5th Cir. 2009) ....................................................................................... 1

*Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W.*,
    961 F.3d 781 (5th Cir. 2020) ............................................................................... 19, 20

**Statutes and Other Authorities**

20 U.S.C. § 1415(i)(2)(C) ................................................................................................ 1

20 U.S.C. § 1415(e)(2) .................................................................................................... 1

Individuals with Disabilities Education Act, 20 U.S.C. § 1415 et seq. .............................. 1

34 C.F.R. 300.8 ............................................................................................................ 25

34 C.F.R. 300.111(a)(1) ............................................................................................... 18

34 C.F.R. 300.304(b) ................................................................................................... 26

34 C.F.R. 300.304(c)(4) ............................................................................................... 26

34 C.F.R. 300.306(c) .................................................................................................... 26

34 C.F.R. 300.309 ........................................................................................................ 26

34 C.F.R. 300.309(a)(3) ............................................................................................... 26

34 C.F.R. 300.309(b) ................................................................................................... 26

34 C.F.R. 300.310 ........................................................................................................ 27

34 C.F.R. 305(a) ................................................................................................. 26

A.D., 503 .......................................................................................................... 22

IDEA............................................................................................................... *passim*

## I.    NATURE AND STAGE OF THE PROCEEDINGS

On September 1, 2022, Parents filed a request for a due process hearing pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415 et seq. Parents argued that Pearland Independent School District ("Pearland ISD" or "District") should have identified A.P. as a student with a disability. The District argued that it had no reason to suspect that A.P. might be a student with a disability until Parents filed the due process hearing request. A hearing was convened in person on June 1 and 2, 2023, and via Zoom on June 5, 2023. The special education hearing officer ("SEHO") issued her order on July 28, 2023, finding that the District met its obligations under the IDEA. Parents appealed on October 26, 2023, creating the current lawsuit.

## II.    STANDARD OF REVIEW/BURDEN OF PROOF

The IDEA permits "any party aggrieved by the findings and decision" of a state administrative hearing to bring a civil action in district court. 20 U.S.C. § 1415(e)(2). The Parents, as the challenging party, bear the burden of proof at the district court level. *Richardson Ind. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 294 n.4 (5th Cir. 2009).

The standard of review on appeal under the IDEA is set forth in the statute: "[T]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "Although the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence." *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118

F.3d 245, 252 (5th Cir. 1997) (quoting *Board of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). The court's task "is not to second-guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the [IDEA]." *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989).

Determining whether a school district complied with its child find duty in a timely manner is a mixed question, which the Court reviews de novo. *Krawietz ex rel. Parker v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018). The underlying factual determinations of the SEHO, however, are reviewed for clear error. *Id.*; *Dallas Indep. Sch. Dist. v. Woody*, 865 F.3d 303, 309 (5th Cir. 2017). Based on the extensive evidence on which the SEHO based her decision, the Court has ample reason here to give the SEHO's decision due weight and defer to her findings.

### III.   SUMMARY OF THE ARGUMENT

The SEHO correctly found that the District had no reason to suspect A.P. was a student with a disability until Parents filed their request for a due process hearing. At that point, the District acted promptly to offer an evaluation, but Parents did not consent to an evaluation by the District.

When a district should refer a student for a special education evaluation depends on a constellation of factors viewed holistically. A district (and SEHO or court reviewing a district's decisions) must review the available information in context to determine if a student is suspected of having a disability and needing specialized instruction.

In this case, A.P. was relatively successful in elementary school. She was homeschooled in sixth grade. Then in seventh and eighth grades, her attendance declined, and her grades fell (though she still passed all her classes). COVID shut down schools in the spring of A.P.'s eighth-grade year. In high school, her absences accumulated, and she failed her core courses. She withdrew after first semester of tenth grade.

Dropping attendance and grades are frequently red flags for child find. But in this case, they were not.

Looking at the broader context, two key factors weigh against a suspicion of a disability and need for specialized instruction. First, when A.P. was in class, her teachers observed that she was a capable learner, and she did not demonstrate concerning behaviors. Her low grades were readily explained by the fact that she missed instruction and assignments when absent. Accordingly, none of her teachers identified that she might have a disability.

Second, Parents excused A.P.'s absences because of family travel and menstrual cramps, with a few days of colds and indigestion. Child find cases involving poor attendance as a red flag generally feature school avoidance, truancy, or medical diagnoses, which can point to a disability. But none of those indicators was present in this case. A.P.'s absences had benign explanations that did not suggest an underlying disability.

Parents accuse the District and SEHO of shifting the burden from the District to Parents to identify a disability. This is an inaccurate understanding of the District's argument and SEHO's findings. The District has the burden of identifying students with

disabilities. To do so, it must rely on information that is observable to staff members, information reported by the student, and information reported by the parents. What Parents told the District is not important because they are responsible for identifying a disability but because it is relevant to what information the District had with which to make decisions. In this case, A.P.'s high school teachers did not observe her to struggle with reading or math skills, A.P. did not report that the material was too difficult or that she needed help, and Parents did not report that A.P. had difficulty with reading or math or had any diagnoses. Based on the available information, the district did not have reason to suspect that A.P.'s failing grades were caused by reading or math deficits or that her absences were caused by a learning, emotional, or medical disability.

Indeed, A.P.'s educational history indicated that she needed not specialized instruction but consistent general education instruction.

## IV.    FACTUAL BACKGROUND

### A.    Elementary and Middle School

A review of A.P.'s academic history shows that, through fifth grade, A.P. passed all of her classes, had reasonably good attendance, and, with the exception of third-grade math, passed the reading, writing, and math STAAR exams. AR 1002-06, 1624-27.  In sixth grade, A.P. was withdrawn from the District and homeschooled. AR 291, 1232-34, 1262, 1387. Few details were provided about her instruction or performance that year except that instruction was mostly provided online, which she stated was difficult for her. AR 1384.

In seventh and eighth grades, A.P. continued to pass all of her classes, but her attendance faltered, and she failed the STAAR tests in seventh grade. AR 292, 691, 1002, 1008, 1262, 1627-28. Not passing the STAAR puts the radar up, but that fact alone does not warrant a referral to special education. Given the unknown impact of homeschooling in sixth grade and the likely negative impact of her poor attendance, intervention rather than a referral was appropriate. AR 1002, 1628-29. Indeed, A.P. responded positively to general education interventions provided in eighth grade. AR 293, 692, 1003, 1009, 1629-30.

**B.    High School**

A.P. attended Turner College and Career High School. Turner uses a block schedule: on Mondays and Wednesdays, students attend periods 1-4; on Tuesdays and Thursdays, students attend periods 5-8; and on Fridays, students attend all classes. Classes on Monday through Thursday are 90 minutes long. AR 1313-14; 335.

To encourage students to master the material, students have the opportunity to retake tests if they score below 70%. AR 1498, 1420-21, 1356, 1462-63. Tutorials are offered by teachers before school, after school, and on Tuesdays and Thursdays at lunch. Tutorials are a time for students to get additional help from teachers, ask questions, and retake tests; students can attend anytime they need or want. AR 1318-19.

In the fall of 2020, parents had a choice for their students to attend in person or online. AR 1314; 1707. Parents chose to have A.P. start the year remotely. AR 1279.

### 1.   *Attendance*

In high school, A.P.'s inconsistent attendance continued, and she no longer maintained passing grades in her core classes. AR 294, 295.

| 9th Grade | Sem. 1 | | Sem. 2 | | 10th Grade | Sem. 1 | |
|---|---|---|---|---|---|---|---|
| | Abs | Grd | Abs | Grd | | Abs | Grd |
| Algebra 1 | 11 | 56 | 16 | 46 | Pre AP Geometry | 10 | 50 |
| World Geography | 14 | 67 | 14 | 65 | AP World History | 10 | 65 |
| Biology | 12 | 70 | 15 | 64 | Pre AP Chemistry | 10 | 54 |
| Pre AP English 1 | 15 | 70 | 14 | 53 | Pre AP English 2 | 10 | 55 |
| Choir | 7 | 79 | 27 | 86 | Choir 2 | 12 | 97 |
| Intro to Culinary Arts | - | 55 | 14 | 66 | Health Science | 8 | 83 |
| Spanish for Native Speakers | 11 | 74 | 13 | 77 | Physical Education | 8 | 84 |

A.P.'s poor attendance prompted Ms. Scott, the school counselor, and Ms. Psarovarkas, A.P.'s Assistant Principal, to have a phone conference with Mr. P. on November 16, 2020, and recommend bringing her back to school in person. AR 1308, 1315, 1316, 1709; 722; 890; 925. At that point, Mr. P. said that A.P. had been having technical difficulties. AR 1288, 1709; 722. Parents had not, however, reached out to Ms. Scott, Ms. Psarovarkas, A.P.'s teachers, or anyone else about the purported technical issues prior to the conference. AR 1279, 1288; 1317, 1328-29, 1386-87; 1460, 1520-21.

When A.P. returned to campus after Thanksgiving, her attendance continued to be poor. AR 1721. During each semester that A.P. was at Turner, she missed between 10 and 16 meetings of each of her classes. Because of the block schedule, that is equivalent to **missing between three and more than five weeks of each class each semester**. AR 294, 295.

Importantly, Parents excused A.P.'s absences. The reasons provided for her absences were primarily noted as menstrual cramps or family travel, with a few instances of colds or indigestion. AR 1254. 871-889; 1395, 1396. 871-889; 693-96. On other days, if A.P. simply did not want to go to school, Ms. P. required her to go. AR 1398.

Mr. P. claimed for the first time at hearing that A.P. was not attending school because she was frustrated that she was not getting the help she needed. AR 1268. He claimed that she was getting sick because of the psychological pressure and the fear she was having going to school. AR 1268. He acknowledged, however, that he and Ms. P. excused her absences and did not tell the school she was having these issues. AR 1270, 1322. Further, no other witness stated that A.P. felt sick due to difficulties at school.

Parents faulted the District for not doing more to address A.P.'s poor attendance. AR 1255. But the District did not ignore her many absences. In addition to automated email notices and letters, Parents received contacts from attendance clerks. AR 1714; 725-870. Administrators and teachers reached out to A.P. and Parents multiple times about A.P.'s lack of attendance and corresponding missing work.[1]  AR 1713, 1714; 1311, 1318; 723; 724. While the District did not initiate additional attendance interventions, those are typically used for unexcused absences and would have had little impact given the reasons for A.P.'s poor attendance. AR 1736.

When staff met with A.P. about her attendance and grades, she did not disclose any academic or social/emotional concerns, instead simply agreeing that she would catch

---

[1] Note that Mr. P. was the one to cancel the meeting with a counselor, Mr. De La Garza, in November 2021. AR 1321-22; 897-900.

up. AR 1713, 1714; 1311, 1318; 723; 724; 1304, 1305. Mr. P. testified that A.P. is

capable of articulating the help that she needs. AR 1282. Similarly, Parents never

disclosed any learning concerns or physical or mental health diagnoses and never

expressed concern that A.P. might have a disability.[2]  AR 1277; 1319, 1719.

The witnesses uniformly agreed that poor attendance will negatively impact

learning and grades. Ms. Ten Napel,[3] the District's expert, stated that "if you're not at

school, you're not able to learn effectively." AR 1620. Ms. Scott explained that poor

attendance negatively impacted A.P.'s grades because she missed so much instruction.

AR 1331. Ms. Psarovarkas explained that even for the work she did when she was in

attendance, poor performance could be a result of missing the lesson where that material

had been taught. AR 1723, 1724.

A.P. recognized that when she was absent from class she would not learn

anything. AR 1388. When asked if absences were the reason A.P. struggled, Mr. P.

responded "Yes, of course so. Yes." AR 1254. Dr. Michael Roman[4], Parents' expert,

recognized that the importance of attendance is "a given." AR 1196.

---

[2] Parents have experience with special education services and evaluations, have received the procedural safeguards multiple times, and have worked with special education attorneys and advocates for years related to their two older children. AR 1231-32. 1278; 1769-70; 992 and 993. 1278.

[3] The District's expert, Amy Ten Napel, is the owner of Total Special Education Solutions. Prior to that, she worked for the Region IV Education Service Center where she was the evaluation consultant. She also has experience working as a licensed specialist in school psychology for school districts. She is licensed by the Texas State Board of Examiners and Psychologists as a licensed specialist in school psychology and psychological associate with independent practice. Ms. Ten Napel specializes in evaluations and child find as well as access to the general curriculum. AR 1614-17; 994-99. Ms. Ten Napel was accepted as an expert in special education. AR 1618.

[4] Dr. Michael Roman was qualified as an expert in neuropsychology. While Petitioners' counsel did not proffer an area of expertise or enter Dr. Roman's CV as an exhibit, based on his testimony, neuropsychology is his area of expertise. AR 1107. His practice was previously about half kids and half adults, but since COVID, is more adults. AR 1103. He holds an LSSP license so that his evaluations will be taken more seriously by schools, but he has never worked as an LSSP. AR 1105-06, 1187.

2.    *Ninth Grade Courses*

A.P. had a challenging course load in ninth grade. While she failed many of her classes, several of her teachers testified specifically to the skills she demonstrated when she was in class. Each of her teachers made efforts to help A.P. catch up after absences, and none suspected a disability or referred her for a special education evaluation.

Ms. Sammons, A.P.'s Pre AP English 1 teacher, said that A.P. needed her to be close by to keep working but did not need her to break down the material or provide repeated explanations. AR 1485-86. A.P. was required to read and comprehend to complete the work in the class; Ms. Sammons did not have any concerns about A.P.'s reading comprehension skills. AR 1461-62. She did not suspect a disability because A.P. could do the work. AR 1462, 1471. 1362, 1371-72.

Parents argued that Ms. Sammons tried to refer A.P. for an evaluation. P. Mot. at 5-6. But that was not the case. Ms. Sammons reached out to Ms. Scott and Ms. Psarovarkas, because A.P. was failing, frequently absent, and not responding when she reached out. AR 1470-71. When asked whether her concerns were related to a potential reading disability, Ms. Sammons clearly stated "No." AR 1471.

Ms. Kice, the World Geography teacher explained that in her class, the answers are not in the text word for word; students have to read, understand, and then apply the information. A.P. was able to do this when in class.  AR 1522, 1527. 1541. 1538-39, 1541.

A.P. also took biology. Although she only passed one semester of the class, she passed the end-of-year STAAR exam. AR 330. A.P. missed passing the Algebra 1 end-

of-year STAAR exam by one point. *Id.* Ms. Psarovarkas reached out to parents to offer tutoring under HB 4545, but they declined. AR 1731.

After ninth grade, Ms. Scott spoke with Mr. P. about A.P. taking summer school courses to make up the classes she had failed. AR 1308; 891-893. A.P. passed English 1, Biology, and Algebra 1 in summer school. AR 1247; 1716-17.

A.P.'s teachers encouraged her to attend tutorials to catch up on the missed instruction and work, but she did not attend. AR 1464, 1523.

A.P.'s teachers also reached out to her and Parents on multiple occasions to provide assistance. AR 1467-69; 926-27, 930, 932. 1525; 937. 1525; 937. 903-908-918. 454-55, 457-58, 459-60, 464-65, 467-69, 470-71, 475-76, 477-78. Parents rarely responded, and they indicated a concern on only one occasion. AR 1469. 1464. In mid-September, Ms. P. responded to an email from Ms. Sammons and relayed that A.P. was struggling to understand the material. Ms. Sammons said she would help and followed up with A.P. AR 1465-66; 921-22. 1474. In January, Mr. P. responded to an email from Ms. Wehman, the biology teacher, to thank her for her support. AR 910. In May, Ms. P. responded to Ms. Sammons that A.P. was doing well and they had been out of town helping a disabled family member for the past month. Ms. P. said A.P. was working on finishing up her classwork to bring her grades up. AR 932. Arella did not report that the work was too hard, and Parents did not share any information with teachers except the statements above. AR 1464. 1527, 1526.

### 3. Tenth Grade Courses

For tenth grade, A.P. wanted to take advanced classes to be challenged. AR 1380. Ms. Scott recommended that A.P. take on-level classes rather than AP and Pre-AP, explaining that the classes are extremely rigorous and require a lot of outside homework. Mr. P. responded that A.P. was interested and confident in taking all classes in a Pre-AP or AP setting. Parents enrolled A.P. in advanced courses despite her failures in ninth grade and Ms. Scott's recommendation. AR 1320; 894-96.

Again, A.P.'s teachers observed that she was a capable student when she was present in class, but her many absences meant missed instruction and assignments, and ultimately failing grades. The teachers tried to help A.P. keep up despite her absences, including encouraging her to attend tutorials and to consider moving to on-level classes. AR 1349. When teachers reached out to A.P. and Parents about her grades, they said she would get her work turned in. AR 1358. 1351, 1358.  1350, 1360. 1422-23. 497, 508-09. Neither A.P. nor Parents reported that she was having difficulty with reading or math or the material generally. AR 1351, 1358. 1360. 1422-23. 1492-93; 508-09. None of the teachers suspected that she had a disability or referred her for an evaluation.

Ms. Munoz, the Pre-AP Geometry teacher, observed that A.P. could answer questions when she was called on. AR 1361-62. A.P. did not demonstrate difficulty with multiplication or division. AR 1372. Ms. Munoz explained that she did not refer A.P. for an evaluation because there were no signs that she might have a disability; she attributed A.P.'s low grades to missed lessons and assignments. AR 1361-62, 1361.

In Pre-AP English 2, A.P. demonstrated she was capable of the work on some assignments, for instance, earning an 80% on one test. AR 1418-19; 325-28. Ms. Castro, the teacher, noted that her writing mechanics and development were average for sophomores. AR 1430-32; 951. Additionally, at the beginning of the year, students took a practice STAAR test, which A.P. passed, scoring in the "approaches" range. In January, the students took a released STAAR test, which A.P. passed, scoring in the "meets" range. A.P.'s scores showed she was secure in reading comprehension and vocabulary. AR 1424-27; 329-30. Ms. Castro did not suspect a disability based on the work that A.P. completed. AR 1433.

Ms. Harkreader, the Pre-AP Chemistry teacher, gave a math test at the start of the school year to see if students had the skills they needed. The test included Algebra 1 skills like manipulating equations and scientific notation (which involves exponents). A.P. earned a 76% on the test, meaning she could solve for x in an equation and convert numbers between scientific notation and standard form. AR 1494-95; 319-21. Ms. Harkreader would check in with A.P. during warm-up and did not see A.P. struggling with the chemistry concepts or with the math. AR 1492-93. There were also assignments where A.P. did well, including some that required solving mathematical equations and some that required answering conceptual questions. AR 1497; 319-21. Ms. Harkreader did not reach out to A.P.'s counselor because she attributed A.P.'s low grades to her absences; she was missing instruction and not coming to tutorials, so she was constantly behind. AR 1502-03, 1509.

The Alternative Choice for Education (ACE) is a school of choice for students who have failed multiple core classes. The program provides a more flexible schedule so students can catch up on credits and graduate with their class. AR 1301, 1322-23. Ms. Scott recommended ACE for A.P. because she struggled with completing assignments, was behind on several credits, and needed help and motivation to catch up and graduate with her class. AR 1303-04; 341. A.P. applied to ACE and was accepted, but Mr. P. notified Ms. Scott that she would not attend. AR 901-02. Instead, Mr. P. requested that A.P. move to on-level classes, which Ms. Scott arranged. AR 901-02.

Weeks later, on February 17, 2022, Parents withdrew A.P. from the District. AR 345-47. After that, Parents attempted several online homeschooling programs. AR 1384-85. 1400-01. 1384, 1388.

### C.    Child Find and Evaluation

The District provides annual training to teachers related to child find. AR 1754-57. When teachers have a concern about a student who is struggling or may have a disability, they reach out to the counselor. AR 1319, 1346-47, 1432-33, 1470, 1502, 1526.

Ms. Ten Napel stated that numerous absences warrant asking questions. She explained that if the absences were due to a chronic health condition, she would want to investigate for an Other Health Impairment. In A.P.'s case, about half of the absences were related to menstrual cramps and almost half were due to being out of town with her family. While the number of absences was staggering, based on the reasons provided, she would not see them as a red flag for a special education referral. AR 1621-22.

Ms. Ten Napel further explained that poor attendance in one year is difficult, poor attendance in four consecutive years is going to have a negative impact on performance. Doing makeup work can help, but when a student misses direct instruction, point-of-performance feedback, and consistent engagement for four years, that will be extremely detrimental to her learning. And because many skills build on each other, gaps in learning can be especially detrimental and difficult to remediate. AR 1634-35, 1644-45.

Parents filed their due process hearing request on September 1, 2022, alerting the District that they suspected a disability, specifically dyslexia. In response to this notice, on October 6, 2022, Ms. Weddington, Director of Special Programs, sent a letter offering to conduct a full individual initial evaluation. She also attached the notice of evaluation and consent for evaluation and offered to answer any questions they might have. AR 1758-59; 598-603.

Parents did not provide consent for the District's proposed evaluation. AR 1280, 1759. On April 14, 2023, Parents provided the District with an independent evaluation completed by Dr. Roman. Upon receipt of the evaluation, the District invited Parents to an ARD meeting to review the evaluation and consider eligibility. AR 1760; 604-59. Despite multiple attempts, Parents did not attend the meeting. AR 1763; 660-65.

The ARD meeting went forward on May 1, 2023. AR 1764; 1567. The team reviewed Dr. Roman's testing, report, and conclusion that A.P. has a Specific Learning Disability in Reading Comprehension, Math Computation, and Math Reasoning but does not have ADHD, dyslexia, or any other psychological disorders. AR 670. The team determined that more information was needed to determine if there was a disabling

14

condition and eligibility under the IDEA; Dr. Roman's evaluation report did not have all of the components required by the IDEA. AR 1567-68, 1765-66, 1768; 670.

The report did not include an observation in the current educational setting and information about current instruction, attendance, and performance. In addition to being legal requirements, these components are critical for understanding the student's learning behaviors, determining whether there is a disability condition, and determining whether the student needs specialized instruction. AR 1570-71, 1766-67. 1645. 1646. Teachers working with a student can also provide insight into the "why" behind student behaviors and performance, like whether A.P. stopped working when the teacher was not nearby because of difficulty with the work, attention, motivation, or something else. AR 1647. Because the team did not have all of the necessary information, they drafted a review of existing evaluation data (REED) to plan to collect needed information. AR 1771; 675-88, 670-71 (deliberations), D5. Parents did not provide consent for the District's proposed evaluation. AR 1281.

Dr. Roman's report is inadequate to establish eligibility because it lacks educational context to determine if A.P.'s deficits were based on a lack of consistent instruction and to determine if she needs specialized instruction. Dr. Roman did not know he was missing grades and test scores for sixth grade because A.P. was homeschooled that year. AR 1196. Dr. Roman did not review or consider data related to A.P.'s attendance and was unaware that it was a concern. AR 1197. Dr. Roman did not observe A.P. in a classroom setting or review any work samples, which he opined were not helpful. AR 1187; 1188. Dr. Roman did not collect information from teachers (past or

present). AR 1187. Dr. Roman did not collect information about her curriculum, attendance, or performance in her homeschool programs. AR 1187-88, 1197-98. Dr. Roman did not have teachers complete rating scales. AR 1853-54.

Dr. Roman did collect some information related to A.P.'s developmental history but did not include it in his report. AR 1188. He did not do vision or hearing screening. AR 1188. 1189. Dr. Roman stated that he was aware that A.P. and her family speak Spanish at home and considered it, but he did not include it in his report. AR 1855. Dr. Roman explained that there are certain things that are required by law for an evaluation that are not his responsibility, those things fall to the ARD Committee to collect and consider. AR 1110.

With respect to Dr. Roman's formal testing, several aspects of the report create questions about its reliability. First, Dr. Roman did not verify or explain the academic scores he obtained that were inconsistent with other information. Specifically, the extremely low math computation scores (and conclusion that A.P. was unable to do multiplication or division) with the higher abilities she demonstrated in school, and her low scores for reading comprehension but much higher writing scores and passing scores on the tenth-grade practice reading STAAR. AR 1164. 1653. 1207. 1166. 1690. Second, the District uses the Cross-Battery Model to guide the analysis of whether a student has a specific learning disability. AR 1557. Dr. Roman did not appropriately apply the model, and after making adjustments to his scoring mid-hearing, determined that one of the cognitive weaknesses he identified was not considered a weakness, which then meant that

A.P. did not meet the criteria for a specific learning disability in mathematical calculations. AR 1879. 1864. 1654-55. 1839, 1840. 1847.

Critically, Dr. Roman did not consider A.P.'s poor attendance record because he did not have that information. However, he testified that "significant issues related to attendance" should also be considered as a possible issue that would get in the way of a student's ability to otherwise benefit from academic instruction. AR 1113. He reiterated that attendance is a factor the ARD Committee might consider when they look at the totality of the evidence and make an eligibility determination. AR 1196. He stated that the importance of attendance is "a given," if a student is not there to benefit from instruction, it becomes an issue. AR 1196.

## V.    ARGUMENT AND AUTHORITIES

### A.    The SEHO Correctly Found that the District Did Not Violate Child Find

#### 1.    *The Child Find Obligation*

The child find obligation requires the District to identify, locate, and evaluate students with disabilities who are in need of special education and related services. 34 C.F.R. § 300.111(a)(1). A district must do so within a reasonable time after notice of facts or behavior likely to indicate a disability. *Krawietz v. Galveston Indep. Sch. Dist.*, 900 F.3d 673, 676 (5th Cir. 2018). Accordingly, a child find violation turns on three inquiries: (1) the date the child find requirement was triggered due to notice of a likely disability; (2) the date the child find duty was ultimately satisfied; and (3) the reasonableness of the delay between these two dates. *Spring Branch Indep. Sch. Dist. v. O.W. ex rel. Hannah W*., 961 F.3d 781, 793 (5th Cir. 2020).

The child find duty is triggered when the district has reason to suspect a student has a disability and that special education services may be needed to address that disability. *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 950 (W.D. Tex. 2008). "The notice or suspicion of disability required to trigger the child-find duty cannot be ascertained by a bright line rule." *O.P. v. by Perez v. Weslaco Indep. Sch. Dist.*, No. 7:21-CV-00352, 2022 WL 3651967, *7 (S.D. Tex. Aug. 24, 2022). But the suspicion must include both that (1) the student has a qualifying disability, and (2) the student needs special education and related services as a result of the disability. *Dallas Indep. Sch. Dist. v. Woody*, 178 F. Supp. 3d 443, 467 (N.D. Tex. 2016), *aff'd* in part and *rev'd* in part, 865 F.3d 303, 320 (5th Cir. 2017).

"[T]he Child Find requirements do not demand that schools conduct a special education evaluation of every student who is having academic difficulties." *Ashley G. v. Copperas Cove Indep. Sch. Dist.*, No. 6:19-CV-00420-ADA-JCM, 2021 WL 1840910, *7 (W.D. Tex. May 7, 2021), *aff'd Ashley G. as Next Friend of M.G. v. Copperas Cove Indep. Sch. Dist.*, No. 21-50437, 2022 WL 797416 (5th Cir. Mar. 15, 2022); *see, e.g., Leigh Ann H. v. Riesel Indep. Sch. Dist.*, 18 F.4th 788, 795–97 (5th Cir. 2021) (finding child find obligation not triggered where the student failed algebra and biology but passed the STAAR exams, and passed English but had to take the STAAR multiple times to pass); *Lewisville Indep. Sch. Dist.*, 122 LRP 20428 (SEA TX 2022) (finding child find obligation was not triggered where student had failing grades due to not attending tutoring classes, not turning in assignments, not doing homework, and missing tests, and the teachers did not suspect a disability or need for special education); *Normangee Indep.*

*Sch. Dist.*, 78 IDELR 239 (SEA TX 2021) (finding child find obligation was not triggered when the student failed the STAAR and was often missing or turning in assignments late due to numerous absences).

The Fifth Circuit has advised that "schools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities. *Spring Branch Indep. Sch. Dist. v. O.W. by Hannah W.*, 961 F.3d 781, 794 (5th Cir. 2020). Failing scores and grades do not necessarily trigger the child find duty. *Ashley G.*, 2021 WL 1840910, at *7; *Oliver v. Dallas Indep. Sch. Dist.*, No. 3:01-CV-2627, 2004 WL 1800878, *4 (N.D. Tex. 2004). Instead "failing grades must be viewed in light of the evidence as a whole," including the student's prior academic success. *Ashley G.*, 2021 WL 1840910, at *7; *Oliver*, 2004 WL 1800878, at *4.

> 2. *The District had no reason to suspect A.P. was a student with a disability in need of specialized instruction prior to the due process complaint.*

Reviewing the evidence as a whole in A.P.'s case demonstrates that Parents did not meet their burden to prove that the District should have suspected that A.P. was a student with a disability and in need of special education. Instead, the District reasonably attributed her low grades to her lack of consistent attendance. And no evidence suggested that her absences were themselves related to a disability.

Other cases have recognized that a lack of consistent instruction will negatively impact a student's grades and learning and thus undermine any inference that a student's struggles indicate a disability or need for specialized instruction. In *Nguyen v. District of Columbia*, the court affirmed the hearing officer's findings that the record was, "at best,

inconclusive that [the student's] emotional problems adversely affect his educational performance. Instead, … the factor most impacting his educational performance is his non-attendance. [And] no credible evidence was advanced that his truancy [was] caused by an emotional disability." 681 F. Supp. 2d 49, 51 (D.D.C. 2010). "In contrast, the link between failure to attend school and failure to succeed academically is far more clear; the student himself admitted his poor attendance and drug use negatively impacted his academic performance." *Id.* at 52.

Similarly, in *Pearland Indep. Sch. Dist.*, 122 LRP 20440 (SEA TX 2022), disruptions to the student's instruction, including a series of temporary teachers, COVID, and virtual learning weighed against finding that the district had reason to suspect the student had a disability and needed special education services. The petitioner failed to show that the student's reading difficulties were not primarily attributable to limited instruction. *Id.*

In this case, too, A.P.'s poor attendance was a clear cause of her low grades. Combined with multiple signals that A.P. was a capable student, her teachers reasonably did not suspect that she was a student with a disability. *D.L. v. Clear Creek Indep. Sch. Dist.*, 695 Fed. Appx. 733, 737-38 (5th Cir. 2017) (recognizing the importance of teacher observations of the student's educational behaviors and progress in determining whether the student needs special education services); *Alvin Indep. Sch. Dist. v. A.D.*, 503 F.3d 378, 384 (5th Cir. 2007) (same).

Additionally, while poor attendance can be a child find trigger, it is not always an indication of a disability or need for specialized instruction. Parents excused A.P.'s

absences and provided standard reasons that were not indicative of a disability or academic struggle. At hearing, A.P.'s father attempted to recharacterize the absences as attributable illnesses caused by academic stress. But neither A.P. nor her mother testified consistent with this new explanation. And A.P.'s father acknowledged that he never informed the school that her absences were related to these issues.

Accordingly, this case is distinguishable from the cases cited by Parents to argue that poor attendance triggers child find. A district must look at a constellation of factors to determine whether a referral for a special education evaluation is warranted. In A.P. v. Pasadena Unified School District, the court said that the district could not shift the child find responsibility to parents by requiring them to inform the district that the student's absences were caused by her disability. No. CV 19-7965-MWF (SSX), 2021 WL 810416, at *8 (C.D. Ca. 2021). In that case, however, the district already had information that would allow it to make the connection: parents previously told the district of the student's diagnoses of social anxiety disorder and depression, which were triggered by stress at school and had caused school avoidance the year before. *Id.* at *6-8. When the student started accumulating absences again in the fall, the district had the necessary context to make a referral. *Id.* The District, in this case, did not have any similar context: it did not know of any diagnoses that might be contributing to A.P.'s absences. Additionally, the parents in the *Pasadena* case did not explain the student's absences, whereas in this case, Parents provided benign reasons to excuse A.P.'s absences.

In the other cases cited by Parents, the schools also had additional information that would indicate a potential disability, which was absent in this case. *See, e.g., Culley v.*

*Cumberland Valley Sch. Dist.*, 758 Fed. Appx 301, 306-07 (3d Cir. 2018) (the district

was informed of the student's debilitating, life-threatening disease and made ad hoc

accommodations before the student experienced a significant academic decline in

conjunction with numerous disciplinary issues; even if the connection to the medical

condition was not clear, the combination of concerns was sufficient); *Malloy v. District of*

*Columbia*, No. 20-CV-03219 (DLF), 2022 WL 971208, at *7 (D.D.C. 2022) (the

student's absences were unexcused and the teachers observed that when the student was

in class, he lacked focus, was unable to complete work successfully, was easily

distracted, exhibited work refusal and disruptive behavior, and scored in the lowest level

on state tests for multiple years running); *Rayna P. v. Campus Cmty. Sch.*, No. CV 16-63,

2018 WL 3825893, at *2 (D. Del. 2018) (the district knew the student had multiple

persistent health issues, which caused her to miss school, and also had information from a

prior school that she received weekly OT services and daily reading intervention); *C.G. v.*

*Five Town Cmty. Sch. Dist.*, No. CIV 05-237-P-S, 2007 WL 494994, at *26 (D. Me.

2007), *report and recommendation adopted*, No. CIV 05-237-P-S, 2007 WL 1051650 (D.

Me. 2007), *aff'd sub nom. C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279

(1st Cir. 2008) (only when the student's failing grades and frequent absences were

combined with knowledge of the student's mental health diagnoses, increasingly

combative behavior at home, and growing resistance to attending school did the district

have reason to suspect the student may have a disability); *A.W. ex rel. H.W. v.*

*Middletown Area Sch. Dist.*, No. 1:13-CV-2379, 2015 WL 390864, at *10 (M.D. Pa.

2015) (the school was aware of the student's anxiety and that it was making it difficult

for the student to come to school as well as behaviors that led to suspensions).  In this case, A.P. did not have any physical or mental health diagnoses or any behavior issues when in attendance that would lead the District to conclude that her absences and resulting low grades might be related to a disability.

Given the connection between A.P.'s academic performance and attendance (A.P. was largely successful academically when attending consistently but began to struggle as her absences accumulated) and the lack of connection between her poor attendance and any suspected disability (her absences were consistently excused for family travel, menstrual cramps, and common illnesses) the District was justified in not suspecting a disability or need for specialized instruction.

3.    *After Parents informed the District of a suspected disability, the District met it's child find obligation by timely offering an evaluation*

The SEHO correctly found that the child find duty was triggered on September 1, 2022, when Parents filed their due process hearing request, notifying the District of their suspicion that A.P. was a student with a disability, specifically dyslexia. The child find duty was satisfied when the District offered to evaluate A.P. on October 6, 2022, approximately one month after the child find duty was triggered. The intervening time encompassed the District's written response to the due process hearing request on September 12, 2022, in which the District expressed its willingness to evaluate A.P., and the resolution period for the due process complaint, during which time the parties participated in mediation. AR 76, 85.

A one-month delay is generally not unreasonable. *See, e.g., Salinas v. IDEA Pub. Schs. Charter Dist.*, 82 IDELR 203 (S.D. Tex. 2023) (finding one month time between notice and offer to evaluate was reasonable where district was gathering information to respond); *Hayes Consol. Indep. Sch. Dist.*, 122 LRP 37411 (SEA TX 2022) (finding a district took "swift steps" to comply with its child find obligation when it proposed an evaluation for a student returning to the district about a month after notice that the student might have a disability).

**B.    Parents did not establish that A.P. is a student with a disability**

Under the IDEA, a student with a disability means a student evaluated in accordance with the Act who is determined to have one of thirteen enumerated disabilities and, as a result thereof, needs special education and related services. 34 C.F.R. § 300.8; *J.L. v. Clear Creek Indep. Sch. Dist.*, 695 Fed. Appx. 733 (5th Cir. 2017) (affirming that a student who did not need specialized instruction was ineligible even when meeting the criteria for a disabling condition); *Henderson Indep. Sch. Dist.*, 122 LRP 46579 (SEA TX 2022) (same).

An evaluation must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information provided by the parent, that may assist in determining whether the student is a student with a disability under the Act and the content of the student's IEP. 34 C.F.R. § 300.304(b). Additionally, students must be assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and

motor abilities. 34 C.F.R. § 300.304(c)(4). To determine eligibility, the team must draw

on information from a variety of sources, including aptitude and achievement tests, parent

input, and teacher commendations, as well as information about the student's physical

condition, social or cultural background, and adaptive behavior. 34 C.F.R. § 300.306(c).

For all suspected disabilities, as part of an initial evaluation, if appropriate, the

team must review existing evaluation data, including evaluations and information

provided by the parents; current classroom-based, local, or State assessments; current

classroom-based observations; and observations by teachers and related services

providers. 34 C.F.R. § 305(a). The IDEA includes additional requirements to determine

whether a student is eligible as a student with a specific learning disability. 34 C.F.R. §

300.309. To find a student eligible, the team must determine that the student's deficits are

not primarily the result of other disabilities, cultural factors, environmental or economic

disadvantage, or limited English proficiency. 34 C.F.R. § 300.309(a)(3). Critically, to

ensure that underachievement is not due to lack of appropriate instruction in reading or

math, the team must consider, as part of the evaluation, data that demonstrate that the

student received appropriate regular education instruction delivered by qualified

personnel. 34 C.F.R. § 300.309(b). Finally, the law requires that the team consider

information from an observation of the student's academic performance in the regular

classroom or, for students who are out of school, an appropriate environment. 34 C.F.R. §

300.310.

As the SEHO, the District, and Dr. Roman recognized, Dr. Roman's report did not

include all of the required elements of an IDEA evaluation and the team needed

additional information to make an eligibility determination. Determining whether a student with a disability is in need of special education requires information beyond the normative data provided by formal evaluations, such as information from teachers about the student's learning and functioning in the educational environment. *D.L. v. Clear Creek Indep. Sch. Dist*., 695 Fed. Appx. 733, 737–738 (5th Cir. 2017) (recognizing the importance of teacher observations in determining whether a student needs specialized instruction). The District has twice proposed to evaluate A.P. to collect that information, but Parents have not provided consent. Without a comprehensive evaluation that meets the requirements of the Act, the SEHO correctly found that the evidence was insufficient to establish eligibility.

While Parents argued that any missing evaluation components were technical, discretionary, or irrelevant and could thus be omitted; that approach is erroneous. Courts and hearing officers reviewing the issue have determined that a comprehensive evaluation that meets the IDEA requirements is necessary to determine eligibility.

In *R.B. v. North East Indep. Sch. Dist*., the court analyzed a situation similar to this one and found that a private evaluation was insufficient to establish eligibility. 2022 WL 488500 at *14–15 (W.D. Tex. 2022). While the student in that case had different needs than A.P., the cases are similar in that the parents had withdrawn the student from the district, brought a child find claim, and attempted to establish eligibility through a private evaluation. In *R.B*., the evaluator included the student's academic history based on the student's and parent's reports but did not include an independent review of the student's records or discussion with the student's teachers. *Id.* Likewise, in this case, while Dr.

Roman reviewed some school records and spoke with A.P. and Ms. P., the records he reviewed were incomplete in notable and meaningful ways. Dr. Roman was unaware of what instruction A.P. received or how she performed in sixth grade or after she withdrew from the District in tenth grade. And, critically, he was also unaware of her numerous absences during seventh through tenth grades. Like the evaluator in R.B., Dr. Roman did not interview or collect any information from A.P.'s teachers, either from the District or any homeschool program.

The court in R.B., explained that determining whether a student is in need of special education and related services as a result of their disability requires a "holistic view of [the student's] unique needs and assessment drawing upon information" from multiple sources. *Id.* at *14. The court was especially concerned with the evaluation's lack of assessment of the student's academic functioning in an educational setting and lack of objective assessment of the student's historic or current academic performance, which were necessary to determine whether the student's disabilities predicated a need for special education. *Id.* The court found that the evidence provided by the student's teachers – who did not observe the behavioral or emotional difficulties identified in the private evaluation – provided a more reliable perspective of her academic proficiency and ability to function in an educational setting. *Id.* at *15. Though the student's grades dropped due to failure to turn in work, lack of preparation for tests, and missed exams, the court found insufficient evidence to establish that the student needed special education and related services. *Id.*

27

The hearing officer in *Rockwell Indep. Sch. Dist.*, conducted a very similar analysis in another case where parents presented a private evaluation but did not consent to an evaluation by the school district. 79 IDELR 116 (SEA TX 2021). In that case, the evaluator administered standardized tests but did not consider criterion-referenced data from the school, records showing the student's current level of functioning in the school setting, input from district teachers, or information from current or former online instructors. *Id.* The evaluator obtained parent and student behavior rating scales, but no teacher rating scales. *Id.* Further, the evaluation lacked an observation of the student in the learning environment, which is required for evaluation for a learning disability. *Id.* The hearing officer also considered it relevant that the student's teachers did not report behavior or performance concerns. *Id.* Like in the current case, the overarching concern with the neuropsychological evaluation in Rockwell was the lack of needed educational context, which led the hearing officer to conclude that the evidence did not establish the student's eligibility under the IDEA. *Id.*

Even assuming the adequacy of Dr. Roman's testing and analysis for the diagnosis of a learning disability, his report is inadequate to establish that A.P.'s deficits are not due to a lack of instruction in reading and math and that she is in need of special education and related services. As explained by District witnesses and as counseled by the cases above, information about a student's functioning in the education setting and feedback from teachers are critical pieces of an evaluation. In addition to being legal requirements, these components are important for understanding whether the student needs special education services. Indeed, given the available information about A.P.'s educational

history and classroom performance, it is more likely that A.P.'s deficits and failing grades indicate a need for consistent general education instruction than that she is in need of any specialized instruction.

Because the District complied with its child find obligation and because Parents did not establish that A.P. is a student with a disability under the IDEA, Parents are not entitled to relief. Even if the Court were to find a child find violation, because A.P. was not ultimately found eligible for special education, the procedural error would not result in a denial of FAPE or any relief for Parents. O.P., 2022 WL 3651967 at *13 (finding a district cannot be liable for an allegedly untimely evaluation where the student is not eligible for special education, "relief [is] preconditioned on an IDEA eligibility determination"); *D.G. v. Flour Bluff Indep. Sch. Dist.*, 481 Fed. Appx 887, 893 (5th Cir. 2012) ("the IDEA does not penalize school districts for not timely evaluating students who do not need special education").

### VI.    CONCLUSION

For the foregoing reasons, Defendant Pearland ISD prays that the Court grant judgment in favor of the District; uphold the decision of the hearing officer in its entirety; dismiss the Plaintiffs' IDEA appeal; and grant Pearland ISD any other relief, both at law and in equity, to which it has shown itself entitled.

Respectfully submitted,

*/s/ Kendra E. Yoch*

Kendra E. Yoch
State Bar No. 24134039
Southern District No. 3864905
kyoch@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
972-853-5115 Telephone
972-692-8334 Facsimile

Rebecca S. Bailey
State Bar No. 24062597
Southern District No. 921729
rbailey@thompsonhorton.com

**THOMPSON & HORTON LLP**
Phoenix Tower, Suite 2000
3200 Southwest Freeway
Houston, Texas 77027
(713) 554-6762– Telephone
(713) 583-9364 – Facsimile

*Attorneys for Defendant*
*Pearland Independent School District*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing pleading has been served upon all parties via the Court's e-filing system on June 3, 2024.

Jordan McKnight
P.O. Box 664
Little Elm, Texas 75068

*/s/ Kendra E. Yoch*

Kendra E. Yoch